IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CV-459-D

| | |
|---|---|
| PENTAIR WATER POOL AND SPA, INC., and DANFOSS DRIVES A/S, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) **ORDER** |
| HAYWARD INDUSTRIES, INC., and HAYWARD POOL PRODUCTS, INC., | ) ) ) ) |
| Defendants. | ) |

Defendants Hayward Industries, Inc. and Hayward Pool Products, Inc. (collectively "Hayward") filed a renewed motion to stay proceedings in this court pending the outcome of proceedings at the United States Patent and Trademark Office ("PTO"). See [D.E. 317]. Plaintiffs Pentair Water Pool and Spa, Inc. and Danfoss Drives A/S (collectively "Pentair") oppose the motion. See [D.E. 328]. As explained below, the court permits all fact discovery to continue through February 7, 2014, which is the date scheduled for the close of fact discovery. Effective at the close of fact discovery, on February 7, 2014, the court grants Hayward's renewed motion to stay, except as to U.S. Patent No. 8,043,070 ("'070 patent"), for which proceedings will continue. In addition, the court construes the term "second increment" in the '070 patent to mean "the size of the smallest step by which the first/second speed value(s) are changeable in response to the touch and hold operation of the increase/decrease buttons."

I.

On August 31, 2011, Pentair filed a complaint alleging patent infringement by Hayward [D.E. 1]. Pentair filed a first amended complaint on December 6, 2011, alleging that Hayward infringed

upon five different patents: U.S. Patent Nos. 7,854,597 ("'597 Patent"), 7,857,600 ("'600 Patent"), 7,686,587 ("'587 Patent"), 7,815,420 ("'420 Patent"), and 8,043,070 ("'070 Patent") [D.E. 66-1]. On January 23, 2012, Senior United States District Judge James C. Fox denied Pentair's motion for a preliminary injunction against Hayward. See [D.E. 119].

In a complaint filed on May 4, 2012, Pentair alleges that Hayward has additionally infringed upon U.S. Patent Nos. 7,704,051 ("'051 Patent") and 8,019,479 ("'479 Patent"). 5:12-CV-251-D, [D.E. 1] (E.D.N.C. May 4, 2012). On August 9, 2012, the court consolidated that action with the first case. See [D.E. 219].

On June 1, 2012, Hayward requested that the PTO institute an inter partes reexamination of four of the seven patents at issue—the '597 Patent, the '600 Patent, the '587 Patent, and the '420 Patent. Def. Mem. Supp. Renewed Mot. Stay [D.E. 318] 8. On June 13, 2012, Hayward moved to stay proceedings in this case until after the reexamination concludes. See [D.E. 168]. On December 18, 2012, this court denied Hayward's motion to stay. See [D.E. 240]. At that time, the PTO had granted reexamination for the '420, '597, '600, and '587 patents, and had issued non-final rejections of every claim of each of those patents. See Order Den. Mot. Stay [D.E. 240] 2. The PTO, however, had not yet analyzed Pentair's responses to those non-final rejections.

Since this court denied Hayward's motion to stay in December 2012, proceedings at the PTO have continued apace. In the proceeding on the '420 patent, the PTO has issued a Right of Appeal Notice rejecting claims 1–4, and confirming claim 5. See [D.E. 319-1] 4. In the proceedings on each of the '597, '600, and '587 patents, the PTO has issued an Action Closing Prosecution rejecting most or all claims. See [D.E. 319-2] 4 (rejecting all but three of the '597 patent's 57 claims); [D.E. 319-3] 4 (rejecting all 36 of the '600 patent's claims); [D.E. 319-4] 4 (rejecting all 11 of the '587 patent's claims). Unlike the proceedings that had occurred before this court denied Hayward's

2

motion to stay in December 2012, these subsequent proceedings considered Pentair's arguments. Additionally, Hayward has initiated inter partes review proceedings at the PTO for the '051 patent and for claim 12 of the '479 patent.[1] In both proceedings, the Patent and Trial Appeal Board ("PTAB") has found it reasonably likely that Hayward will prevail. See [D.E. 319-7] 31 (the '051 patent); [D.E. 319-8] 22 (the '479 patent).

II.

District courts have inherent authority to stay patent litigation pending conclusion of parallel proceedings at the PTO. See Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426–27 (Fed. Cir. 1988) (citing Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)). The court's decision to grant or deny a stay is discretionary. NTP, Inc. v. Research In Motion, Ltd., 397 F. Supp. 2d 785, 787 (E.D. Va. 2005). Courts weigh three factors when determining whether to grant a stay pending reexamination: (1) "whether a stay would unduly prejudice the nonmoving party"; (2) "whether a stay would simplify [the] issues and the trial of the case"; and (3) "the stage of the proceedings," including whether discovery is complete and a trial date has been set. Akzenta Paneele + Profile GmbH v. Unilin Flooring N.C. LLC, 464 F. Supp. 2d 481, 484 (D. Md. 2006); see Biogaia AB v. Nature's Way Prods., Inc., No. 5:10-CV-449-FL, 2011 WL 3664350, at *1 (E.D.N.C. Aug. 18, 2011) (unpublished). In initially denying the stay, this court found that the first factor weighed heavily against granting a stay, the second factor weighed slightly against a stay, and the third factor weighed slightly in favor of a stay. Order Den. Mot. Stay 4–7.

---

[1] Effective September 16, 2012, Congress replaced the inter partes reexamination process with a new inter partes review process. See Leahy–Smith America Invents Act, Pub. L. No. 112-29, § 6(a), 125 Stat. 284, 299–304 (2011) (codified at 35 U.S.C. §§ 311–319). "The purpose of this reform was to convert inter partes reexamination from an examinational to an adjudicative proceeding." Abbott Labs. v. Cordis Corp., 710 F.3d 1318, 1326 (Fed. Cir. 2013) (alteration and quotations omitted). Unlike inter partes reexaminations, inter partes reviews are required by statute to be completed in one year. 35 U.S.C. § 316(a)(11).

3

As for the first factor, this court initially found a significant risk that a stay would unduly prejudice Pentair, because the reexamination process could last many years and "would effectively prevent Pentair from asserting its right as a patent holder to enjoin competitors from making or selling its products." Id. 4. But subsequent proceedings at the PTO have mitigated these concerns. In the four inter partes reexamination proceedings, the PTO has moved with dispatch. As Hayward notes, those proceedings "are either complete, or will be completed within the next few months," at which point the appeals process will begin. Def. Rep. Supp. Mot. Stay [D.E. 338] 9. The pace of proceedings thus far suggests that the length of the reexamination process will be on the lower end of the range of possibilities the court considered in its December 2012 order. Moreover, by statute, the two inter partes review proceedings will conclude within one year of filing. See 35 U.S.C. § 316(a)(11).

Additionally, it appears less likely that the patents at issue in this litigation will survive the review and reexamination proceedings. When this court initially denied a stay in December 2012, the PTO had only just decided to reexamine the '420, '597, '600, and '587 patents, and Hayward had not yet petitioned for inter partes review of the '051 and '479 patents. Furthermore, in December 2012, the PTO and PTAB had not considered Pentair's arguments on the merits. Now, the PTO has considered Pentair's arguments in inter partes reexamination proceedings, and has rejected most or all of the claims in the '420, '597, '600, and '587 patents. Likewise, the PTAB has considered Pentair's arguments in the inter partes review proceedings, and has found it reasonably likely that Hayward will prevail. In short, this court's initial concern that a stay "would effectively prevent Pentair from asserting its right[s] as a patent holder" has been mitigated by the increasing likelihood that Pentair will be found not to have such rights. Cf., e.g., Baseball Quick, LLC v. MLB Advanced Media L.P., 2013 WL 5597185, at *1 (S.D.N.Y. Oct. 9, 2013). Thus, the first factor no longer

4

weighs against granting a stay.

As for the second factor, this court initially found that a stay pending reexamination would "not greatly simplify the case even if all of the patent claims under reexamination are cancelled," in significant part because Hayward had not requested reexamination of all the patents at issue in this litigation. Order Den. Mot. Stay 4–6. Now, all but the '070 patent, which is the least complex of the seven patents at issue, are being reexamined or reviewed. Thus, the potential for proceedings at the PTO to greatly simplify the issues in this litigation has substantially increased, and the second factor now weighs in favor of granting a stay.

As for the third factor, this court previously found that "the substantial discovery and claim construction that remain outstanding weigh slightly in favor of a stay." Order Den. Mot. Stay 7. Since the court initially denied a stay, fact discovery has continued, the parties have completed claim-construction briefing, and this court has amended the scheduling order to extend discovery deadlines and delay trial until August 4, 2014, resulting in a slightly more protracted schedule. See [D.E. 312]. Fact discovery is scheduled to close on February 7, 2014. See id. The parties and the court have continued to expend resources, but work remains to be done, including the vast majority of claim construction, further expert discovery, pretrial motions, and trial. And the progress the parties have made in fact discovery (and will make between now and February 7, 2014) weighs in favor of granting a stay in one respect: much relevant evidence that might have been lost had the court stayed the case a year ago has now been preserved. Thus, the third factor now weighs more heavily in favor of granting a stay.

In sum, the risk of a stay causing prejudice to Pentair has decreased, the potential for the PTO proceedings to simplify the issues before the court has substantially increased, and much work remains to be done by the parties and by the court in this litigation. Thus, the court exercises its

5

discretion to stay litigation with regard to proceedings on the '420, '597, '600, '587, '051, and '479 patents.

With regard to proceedings on the '070 patent, which is not subject to inter partes reexamination or review, the court denies Hayward's renewed motion to stay. The court has completed a <u>Markman</u> hearing as to the '070 patent, and will proceed with claim construction concerning the '070 patent.

III.

Hayward has asked the court to construe the term "second increment" from the '070 patent. <u>See</u> Am. Joint Claim Construction Statement [D.E. 244] 6. That term appears in the context of the following claim language:

> the user interface including an increase button and a decrease button for altering [the motor-speed value], the increase button and the decrease button being capable of an actuate and release operation to alter [the motor-speed value] by a first increment and a first touch and hold operation to alter [the motor-speed value] by a <u>second increment</u>, the <u>second increment</u> being greater than the first increment.

U.S. Patent No. 8,043,070 ("'070 Patent"), col. 16, ll. 35–44 (emphasis added). The parties propose the following constructions for the term "second increment":

Pentair: An amount by which the speed value changes.

Hayward: The size of the smallest indivisible step by which the [motor-speed value is] changeable in response to the touch and hold operation of the increase/decrease buttons.

Am. Joint Claim Construction Statement, Attach. A [D.E. 244-1] 2. As explained below, the court adopts Hayward's proposed construction, but strikes the word "indivisible."

The patent describes one example embodiment of the relevant aspect of the claimed invention in this way:

> [T]he speed alteration buttons . . . can be configured to alter the speed in various increments, such as to increase the speed by 1 RPM, 10 RPM, or the like per

6

> actuation of the button . . . . In one example, the speed alteration buttons . . . can be quickly actuated and released to increase/decrease the motor speed by 10 RPM. In addition or alternatively, the button . . . can also be configured to continuously alter the speed value an amount corresponding to the amount of time that the particular button . . . is actuated (e.g., a touch-and-hold operation), such as to increase/decrease the motor speed by 20 RPM until released.

'070 Patent, col. 8, ll. 24–34. On this embodiment, if one wanted to change the motor-speed value from 1,000 RPM to 1,100 RPM, one would have two options: (1) tapping the increase button ten times, increasing the motor-speed value by 10 RPM each time, or (2) pressing and holding the increase button, then releasing once the motor speed had increased by 20 RPM five times.

The parties agree that, in this example, the "first increment" (the increment associated with tapping and releasing the increase button) would be 10 RPM, the amount by which the motor-speed value goes up each time one taps the button. But the parties disagree about what the "second increment" (the increment associated with pressing and holding the button) would be. Under Pentair's construction, the "second increment" in this example would be 100 RPM, the difference between the starting motor-speed value and the ending motor-speed value. Under Hayward's construction, the "second increment" would be 20 RPM, the individual step of which there were five to go from 1,000 to 1,100 RPM. Essentially, the parties disagree about whether "second increment" refers to the rate of change when one touches and holds the button (for example, 20 RPM per second), or the cumulative amount of change from touching and holding the button (for example, 100 RPM after holding the button for five seconds). Under Pentair's proposed construction, "second increment" refers to the rate of change. Under Hayward's construction, "second increment" refers to the cumulative amount.

"[T]he words of a claim are generally given their ordinary and customary meaning." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quotations omitted). "[T]he

7

ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art." Id. at 1313. "If the claim language is clear on its face, then . . . consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified." Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001). If the claim language is not clear on its face, then the court can consider other evidence intrinsic to the patent to resolve the lack of clarity. Id.; see Phillips, 415 F.3d at 1312–17. The court also may consider extrinsic evidence, such as expert testimony, although such evidence has limited usefulness. See Phillips, 415 F.3d at 1317–18. In particular, "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." Id. at 1318.

The parties' briefs on the '070 patent mostly explain and restate the difference between their positions. In advancing its proposed construction, Pentair essentially makes two arguments, neither of which are persuasive. First, Pentair argues that, under Hayward's construction, the "touch-and-hold operation would not 'alter . . . the [motor-speed value] by a second increment,' as expressly required by claim 1, but by multiples of the second increment." Pl. Resp. Br. [D.E. 276] 30 (quoting the '070 Patent at c. 16, ll. 42–43) (first alteration in original) (emphasis omitted). This argument begs the question, hiding the interpretive dispute in the word "alter" instead of in the words "second increment." Consider again the example of using the press-and-hold operation to go from 1,000 RPM to 1,100 RPM in five steps of 20 RPM. If the "alteration" is the cumulative change of 100 RPM, then Pentair's argument is correct that Hayward's construction would involve altering the speed value by multiples of the second increment. But if each 20 RPM step is an "alteration," then Hayward's construction comports with the claim language.

Second, Pentair argues that "because the claim expressly recites that the alteration in speed

8

from a touch-and-hold operation results in a 'second increment,' logically the 'second increment' is not a fixed value. Otherwise, a touch-and-hold operation would only result in a change in speed by a fixed value, regardless of how long the button is held." Pl. Resp. Br. 31. Again, Pentair begs the question, this time by assuming in its argument that its proposed construction is correct. Hayward does indeed claim that the "second increment" is a fixed value, but under its proposed construction, that would not mean, as Pentair suggests, that the touch-and-hold operation would change the motor-speed value by the same amount no matter how long the button is held. The parties agree that the longer the button is held, the more the motor-speed value goes up or down. All Hayward's construction requires is that it will go up or down at a uniform rate.

As for Hayward, it makes two textual arguments in support of its proposed construction. First, Hayward argues that Pentair's proposed construction is circular: "if Pentair's construction is plugged into the claim language, Claim 1 requires 'a first touch and hold operation to alter the . . . speed value by [an amount by which the speed value changes].'" Def. Resp. Br. [D.E. 275] 44 (alterations in original). In other words, the patent requires that the touch-and-hold operation alter the motor speed "<u>by</u> a second increment," but "one cannot adjust <u>by</u> a value that is not established until after the adjustment is complete," as Pentair's construction would have it. Id. (first emphasis added).

Second, Hayward argues that Pentair's proposed construction would cause the word "increment" to have different meanings within the same claim: "Altering the speed value by 'a first increment' clearly refers to adding or subtracting a pre-established amount of RPMs from the present speed value. Indeed, the user would think the system broken if the pump sped up by a random, variable amount every time the button was tapped." Def. Resp. Br. 45. It is plain from the text that the first increment is a fixed value, but under Pentair's construction, the value of the second

9

increment would vary depending on how long the user held down the button. Thus, Pentair's proposed construction would require that the term "increment" encompass both fixed values and non-fixed values.

As for the prosecution history, on July 27, 2009, Pentair amended what would become the '070 patent to teach for the first time the touch-and-release and touch-and-hold operations found in the final patent. See Ex. PMX-9, Pt. 5 [D.E. 255-4] 21. Before that amendment, the claim language had taught increase and decrease buttons, but had not specified that those buttons would have two types of operations associated with them. Because "second increment" is associated with the touch-and-hold operation, this was also the first time that term appeared as claim language. In making this amendment, Pentair was attempting to distinguish its invention from prior art that involved increase and decrease buttons capable of only one type of operation. See id. 17–18.

On November 27, 2009, the PTO rejected Pentair's amended claims. See id. 36–59. As for the amendment that taught increase and decrease buttons capable of both a touch-and-release and a touch-and-hold operation, the PTO examiner offered two rationales for rejection. First, the examiner took "official notice of the control technology for 'press and hold' alteration of input values," noting that "[t]his is a common feature found on almost every digital clock or instrument that allows a user to change a parameter of operation and/or a setting by an increase or decrease button." Id. 43–44. In the alternative, the examiner cited as prior art a patent called Sakamoto, which involved an electronic alarm clock capable of being adjusted using both a touch-and-release operation and a touch-and-hold operation. Id. 44–45; U.S. Patent No. 5,559,762 ("Sakamoto"). The examiner also cited, but did not discuss, a patent called Cotis, which involved a "bidirectional multi-speed indexing" control system. Ex. PMX-9, Pt. 5 at 73; U.S. Patent No. 6,388,642 ("Cotis"). The specifications in Cotis suggest use in a digital clock, but the patent noted that "the present invention

10

has utility in other applications of indexing, such as, for example, in stepwise speed control of a motor." Cotis, col. 5, ll. 13–15.

As Pentair noted at the claim construction hearing, "the meaning of the term second increment . . . was not a focal point of prosecution." Transcript of Claim Construction Hearing ("Tr.") [D.E. 337] 28. But the specifications in both the Sakamoto patent and the Cotis patent employed variations of the word "increment," and the use of that word in the prior art may be helpful in interpreting its meaning in the '070 patent. For example, Sakamoto described how its touch-and-hold operation works as follows:

> For the fast processing of the alarm time, when a switch input that is a press-down-and-hold input lasts for 1 to 2 seconds, the alarm time is incremented or decremented by 1 minute at a frequency of 8 Hz thereafter. In other words, the fast forwarding period starts 1 to 2 seconds after the switch is pressed and held down, and after that, the alarm time is incremented or decremented on the 1-minute basis once every 1/8 second. Therefore, the alarm time is incremented or decremented by 8 minutes each second.

Sakamoto, col. 15, ll. 51–59. The understanding of the term "increment" conveyed in this passage comports with Hayward's proposed construction. If one holds the switch described in Sakamoto down for two seconds, the alarm time would change by 16 minutes. But the term "increment" is used to describe the one-minute change that would occur every 1/8 second, and not the cumulative 16-minute change.

The word "increment" is used similarly in the following passage of Cotis, which describes "an illustrative sequence of actuations of [two] buttons . . . and the resulting bidirectional multispeed indexing of the display unit":

> As shown, the button . . . is pressed at time 1 and released at time 2. Depression of the button . . . at time 1 results in a single increment of the display unit . . . . The button . . . is then depressed again at time 3 and held until time 13. The pressing of the button . . . at time 3 results in another single increment of the display . . . . The continued holding of the button . . . longer than an auto-index activation delay τ until

11

> time 4 causes a fixed speed indexing to occur . . . . At time 5, [a second] button . . . is also pressed and held until time 6. This results in an increasing of the rate of incrementing the display unit . . . . The [second] button . . . is released at time 6 until time 8, so during this time, the rate of incrementing the display unit . . . decreases down to the fixed speed . . . . At time 8, the [second] button . . . is pressed again, causing the rate of incrementing the display unit . . . to increase . . . . This increase continues until some maximum speed is reached, . . . at time 9. At time 10, the [second] button . . . is released so the rate of incrementing the display unit . . . decreases.

Cotis, col. 2, ll. 26–48. As with Sakamoto, the understanding of the term "increment" in this passage of Cotis comports with Hayward's proposed construction. The "increment" is not the cumulative change associated with a press-and-hold operation; it is the discrete step by which the relevant value changes during the press-and-hold operation.

On May 27, 2010, Pentair asked the PTO to reconsider its decision to reject Pentair's claims. See Ex. PMX-9, Pt. 6 [D.E. 255-5] 9–34. Pentair did not discuss Cotis, but argued that Sakamoto did not apply because "[o]ne of ordinary [skill in the] art in the field of pump motors would not look to the teachings of an electronic alarm clock to solve the problem of how to allow a user to specify a pump motor speed between two or more preset pump motor speeds." Id. 25. The PTO eventually did reconsider, and granted the '070 Patent, but Cotis and Sakamoto remained listed in the '070 Patent as cited references. See '070 Patent at 2.

As for expert testimony, both parties filed expert declarations in support of their proposed constructions, see [D.E. 248, 278] (Pentair); [D.E. 256] (Hayward), but these declarations merely explain the differences in the parties' positions followed by conclusory assertions about which position is correct. Thus, they are not useful. See, e.g., Phillips, 415 F.3d at 1317–18.

In sum, the court adopts Hayward's proposed construction, but strikes the redundant word "indivisible." Accordingly, the term "second increment" in the '070 patent is construed to mean "the size of the smallest step by which the first/second speed value(s) are changeable in response to the

12

touch and hold operation of the increase/decrease buttons."

IV.

In sum, the court GRANTS IN PART and DENIES IN PART Hayward's renewed motion to stay [D.E. 317]. Fact discovery is scheduled to end on February 7, 2014. The court permits such fact discovery to continue. Effective at the close of fact discovery, on February 7, 2014, all proceedings are stayed except as to the '070 patent. Proceedings concerning the '070 patent will continue. The term "second increment" in the '070 patent is construed to mean "the size of the smallest step by which the first/second speed value(s) are changeable in response to the touch and hold operation of the increase/decrease buttons." Additionally, the court GRANTS Pentair's motion to seal [D.E. 331] and DENIES Hayward's motion to supplement [D.E. 322]. Furthermore, for good cause shown, the court GRANTS Pentair's motion to amend the scheduling order to permit filing an amended reply to defendants and counter-claim plaintiffs' second amended counterclaims [D.E. 313]. Pentair shall file the amended reply not later than February 7, 2014.

In light of this order, the parties shall confer on any proposed changes to the schedule to meet the trial date of August 4, 2014. The parties shall file a joint proposal on any proposed changes to the schedule not later than February 14, 2014. The joint proposal shall state any jointly proposed changes and also set forth each party's position on any scheduling topic about which the parties disagree.

SO ORDERED. This **31** day of January 2014.

JAMES C. DEVER III
Chief United States District Judge